Findings Re: Petition For Termination Of Parental Rights
Ana Marie M. was born on February 24, 1986 in Hartford. The mother of the child is Nilda P. d/o/b September 24, 1964; the father is Lionel M., age twenty-five, listed on the petition as "whereabouts unknown." The child was adjudicated neglected (medically and physically) and uncared for (specialized needs) on March 2, 1990; she was committed to the Department of Children and Youth Services (DCYS) on September CT Page 3559 18, 1990, which eighteen month commitment was extended on January 10, 1992 (effective 3/18/92) to September 18, 1993.[1]
The instant termination petition was filed by DCYS on July 22, 1991.[2]
Identical statutory grounds are alleged as to both parents: General Statutes Section 17a-112 (formerly Section 17-43a)(b)(1) abandonment, (2) failure to rehabilitate, and (4) no ongoing parent-child relationship.[3]
Notice And Jurisdiction
Nilda P.'s address is shown on the termination petition as 425 Zion St., #12, Hartford, Ct. The return of service shows in hand service of the petition on mother on July 25, 1991.
On July 22, 1991, DCYS filed a motion for an order of notice by publication, stating that respondent/father last resided in Hartford at an unknown address. The motion was granted and the court file contains a confirming affidavit, with clipped legal advertisement, attesting that a legal notice with respect to the "Petition For the Termination Of Parental Rights of Lionel [M.], of parts unknown" was published in the Hartford Courant on July 30, 1991.
Service has been effectuated in accordance with the requirements of law, and this court has jurisdiction to hear and adjudicate the instant petition.[4] General Statutes Sections17a-112, 45a-716, and 45a-717.
Standard of Proof
The term "termination of parental rights" is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes Section 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972); In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). CT Page 3560
The integrity of the family unit is protected by theNinth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. Stanley v. Illinois, supra. Both the child and the parent(s) have constitutionally protected interests in the integrity of the family. Santosky v. Kramer, 455 U.S. 75 (1982). And, the "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." See: In Re Juvenile Appeal, 187 Conn. 431, 435 (1982).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights by established by "clear and convincing evidence, not merely a fair preponderance." Santosky v. Kramer, supra. Accordingly, the standard of proof as mandated by Conn. General Statute Section 17a-112(b) and Conn. Prac. Bk. 1049 is "clear and convincing" evidence. See: e.g. In Re Juvenile Appeal (84-3), 1 Conn. App. 463 (1984).
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed. In Re Juvenile Appeal (84-AB), 192 254, 262 (1984); In Re Nicolina T., 9 Conn. App. 598, 602
(1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds may inquiry be made regarding the ultimate best interests of the child. In Re Juvenile Appeal (84-AB), supra at p. 262. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984); In Re Nicolina T., supra.
Factual Findings
The evidence and documentation before the court established the following facts.
Ana Maria M. is a six year old little girl who was born with congenital syphillis, multiple medical problems (heart and liver maladies), spastic quadriplegic cerebral palsy, and mental retardation.[5] Prior to the filing of the neglect/uncared for petition (12/27/89), DCYS had received a number of referrals regarding the care of this child; most of the referrals related to respondent/mother's failure to keep medical appointments for the child, her lack of attention to the nutritional needs of Ana Maria M., and her not bringing the child for physical therapy.[6]
In February 1990, the OTC issued upon a report from Hartford CT Page 3561 Hospital that the mother had not complied with agreements made earlier at Newington Children's Hospital regarding appropriate methods of feeding the child, bi-weekly visits for weight checks, etc.; the Hartford Hospital diagnosis was a "Failure to Thrive based on environmental factors", premised on mother's inability or refusal to comply with medical recommendations, thereby placing the child in "imminent danger of worsening developmental delays and deterioration of already limited physical abilities from inadequate nutrition."
Under the OTC, the child was initially placed in a specialized needs foster home in Orange, Connecticut where the foster parents had skill, experience, and training for the care of a quadriplegic, palsied child; this placement was approved by the Department as no foster facility suitably equipped to meet the child's specialized needs was available in the Hartford area. The child remained in the Orange foster home from February 23, 1990 to approximately May 4, 1990; in May, the child suffered an accident resulting in a broken leg and was hospitalized until May 29, 1990. Upon her discharge from St. Raphael's Hospital, Ana was placed in the Westport home of Nancy and Dale C.; this too was a specialized needs foster placement, the Cs, according to the evidence, having had medical training and being specialists in dealing with the handicapped, particularly those afflicted with cerebral palsy.[7] The child has remained in the C. foster home to date.[8]
It was anticipated that Nilda P. would visit regularly and, by observing the specialized, trained foster parents, obtain skill in caring for and meeting the demanding needs of this child. The DCYS worker took respondent/mother to visit Ana in Orange on March 9, March 20, April 11, and April 25, 1990. While the child was hospitalized, the mother was taken to visit with her on three occasions. In June, following Ana's placement in the C foster home (Westport), mother visited with the child on or about June 22, 1990 in Hartford, at the conducting of the court-ordered psychological evaluation. Respondent/mother was transported to Westport for visitation June 13, July 9, 30, and on August 23. On the last date (8/23/90), Nilda P. advised the social worker that she did not need transportation to Westport and stated that if the Department would furnish her $30., she could arrange to have a man transport her for visitation. Arrangements were made for her to visit at the C home on a Saturday in September; she was provided the requested funds, but did not show up to visit, or call the C's to cancel the scheduled visitation.[9] Another visit was then scheduled for October 22, 1990; on this occasion, the worker drove the mother to New Haven, took the Metro train with her to Westport, where they were picked up at the station by the C's. A visit was then scheduled for October 27 and mother was given the money to cover CT Page 3562 the entire round trip (bus or train from Hartford, train to Westport, and taxi fare to the C's home). She was told that the foster family had cancelled their plans to go into New York on that date in order that she could visit with Ana. On the preceding day (10/26/90), the worker gave respondent/mother the money, confirmed that she would be traveling to Westport on Saturday, and impressed on her the importance of telephoning the C's if for any reason she decided not to visit with her daughter on the scheduled date. Respondent/mother neither appeared for visitation at Westport, nor called the C's to advise that she would not be coming to their home on that date. Thereafter, on November 5, 1990, the worker wrote Nilda P. (at 425 Zion Street) informing her that she should make her own arrangements for future visitation, stating that this was the second time she was given money for transportation (as she had requested), and yet did not keep the scheduled visitation appointment (or call to cancel and/or explain).[10] In all, respondent/mother visited with the child approximately eleven times in 1990. Subsequent to October 1990, respondent/mother did not visit the child; on various occasions between November 1, 1990, and March 1, 1991, the social worker went to mother's Hartford apartment and asked why she would not visit in Westport; according to the worker, she gave no explanation.[11] Prior to October 1, 1990, respondent/mother would call the foster home(s) to inquire of the child; she did not do so after that point in time.
In the beginning of April 1991, the case was transferred to another social worker; initial attempts to contact mother by telephone and through home visits (at the Zion Street apartment) were unavailing.[12] In early June, the new worker conversed with the mother's therapist at the Institute For The Hispanic Family (counseling put in place by DCYS); Nilda P. had not appeared for several scheduled counseling sessions at the Institute and the social worker instructed the therapist to have the mother call DCYS when and if she attended a future therapy session. In mid-August 1991, after the C's had relocated in Massachusetts, respondent/mother requested visitation with the child, stating she had a friend who would drive her if DCYS would furnish the money (requested $30) for gas; mother stated she had the C's telephone number and would call them and make the necessary arrangements. The social worker also called the C's and was told that the family had plans for Labor Day week-end, but would cancel so that respondent/mother could visit her child. The social worker went to mother's home, gave her funds for transportation expenses, and told mother to call the C's on Saturday to confirm that she would be coming to their home on Sunday at approximately 1:00 PM; respondent/mother telephoned the C's on Saturday, confirmed she would be coming, received directions to the foster home, but on Sunday, did not appear in Massachusetts for the arranged visit. Respondent never called CT Page 3563 the C's to tell them she would not be coming for the visit and, when the worker inquired of her as to why she did not go to Massachusetts, the mother stated her driver did not come to take her as planned.
A PPT was scheduled in Massachusetts for 9/19/91, arranged by the Hartford Board of Education; mother was informed by letter and by the DCYS worker of the PPT date; it was felt she should attend the PPT and also be able to visit with Ana. The worker did not hear from respondent/mother, she did not attend the PPT, and she later advised the worker she had been too busy to go to the PPT.[13]
Respondent/mother was never told she could not visit with the child, either by DCYS or by the foster parents. DCYS furnished transportation for the visitation until the mother informed the Department that she wished simply to be given funds, and that she would make her own arrangements for transportation. Respondent/mother has not visited with the child since October, 1990.
Following the evaluation of Dr. Suarez, and consistent with the psychologist's recommendations, DCYS referred Nila P. to the Institute For The Hispanic Family for counseling and parenting classes to deal with her emotional anxiety, anger, and hostility, and to develop insight into Ana's difficulties, as well as to learn more about the child's many needs, how to fulfill those needs, and how to stimulate Ana's development. At the dispositional court hearing on September 18, 1990, the expectation was set that mother participate in counseling, both individual and parenting, through the Institute; on September 20, 1990, respondent/mother was referred by DCYS to the Institute for appropriate counseling. Counseling was to take place weekly; between September 20, 1990 and July 27, 1991, the mother attended only eleven of the twenty-one scheduled, individual counseling sessions. On some occasions she called to cancel, at other times she did not; in view of Nilda P.'s absenteeism, the Institute tried placing her with a younger therapist, but that effort also was unsuccessful. Respondent indicated she was only at the Institute because DCYS insisted and, according to the testimony, she simply refused to work at all with the therapist; similarly, she did not complete the parenting classes, having been a sent on numerous occasions. As stated, in a period of some nine months, respondent/mother attended only eleven of the weekly counseling sessions; on or about July 27, 1991, the Institute wrote the mother discontinuing her from the individual counseling due to her lack of cooperation and regular participation; a copy of that letter was forwarded to DCYS. It was the therapist's observation that respondent/mother's attendance at the Institute was erratic and CT Page 3564 inconsistent, and that her commitment to therapy appeared questionable; further, that Nilda P. did not comprehend, and was not cognizant of, the seriousness of her situation regarding appropriate involvement with this seriously handicapped child.
Nilda P. (d/o/b 9/24/64) was born in Vega Baja, Puerto Rico; she was brought to Connecticut at age two and has a ninth grade education. She established a common-law marriage with Feliciano D. at age sixteen, of which union two children were born: Miretza D., d/o/b 12/3/81, and Feliciano D., d/o/b 9/26/83. After having been separated from Mr. D. for approximately two years, Nilda P. established a second common-law marriage with Lionel M., from which relationship two children were born: Ana Maria M., a/k/a Ana P., d/o/b 2/24/86, and Jacqueline M., d/o/b 9/12/89. The mother currently resides with two of her children, Feliciano D. (age 8) and Jacqueline M. (age 2); the oldest child Miretza D. (age 10), resides with the maternal grandmother at another apartment unit in the Zion Street building.
According to documentation in the court file, the child's father, Lionel M., is approximately twenty-five years of age, has been separated from Nilda P. since late 1989, and has been incarcerated twice for drug related crimes. He has had no involvement with the child and his whereabouts have remained unknown throughout the legal proceedings involving Ana Maria M. Although mother reports having seen him on Hartford streets, he has not been located and he has fulfilled no role whatsoever with regard to this child's life, at any time relevant to these court proceedings.
The child, Ana Maria M., d/o/b 2/24/86, was born at Hartford Hospital, following a gestation period of twenty-seven weeks, with congenital syphillis, and weighing slightly over two pounds; Ana has suffered multiple medical problems, as stated, which are associated with the congenital syphilis syndrome, and which include quadriplegic cerebral palsy and mental retardation. Ana Maria M. has had a history of failure to thrive difficulties due primarily to environmental problems related to the child's inability to adequately gain weight. The child, now six years of age, is still quite small, weighing, as of August 1991, approximately thirty pounds. However, Ana has made tremendous progress as the result of the continuing, skilled, intensified care she has received in the specialized foster homes. The child is now happy and smiling, has a limited vocabulary, and is clean, responsive, with some degree of mobility. In Westport, Ana attended the Regional Center at Coleytown Elementary School where she received physical, occupational, and speech therapy. During the summer months, she attended part-time therapy sessions, including therapeutic CT Page 3565 horseback riding to improve her muscle tone. The child is happy and responsive, referring to Mrs. C. as "mommy"; she has reached the point of communicating in part through a special book,[14]
and, in general, has made substantial and significant advances while in the care of this specialized foster family. The C's wish to adopt Ana, and that is the DCYS plan.
Mrs. Ana P., the maternal grandmother, resides in the first floor apartment at 425 Zion Street and, as stated, is raising Nilda P.'s oldest child, Miretza D. She also assists respondent/mother with the care of the other two children, Feliciano D. and Jacqueline M.; the maternal grandmother has expressed no interest in taking on the very demanding additional responsibilities of caring for and parenting Ana Maria M., and is not a realistic resource for this specialized needs child. No other maternal relatives, and no paternal relatives, are available as prospective caretakers for this child.[15]
Adjudication
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. As stated, the "clear and convincing" burden of proof is constitutionally mandated. Santosky v. Kramer, supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in an ordinary civil action and that required to find guilt; there must be "more than average certainty on the part of the factfinder." In Re Juvenile Appeal (84-3), 189 Conn. 276, 297
(1983); Dacey v. Connecticut Bar Assn., 170 Conn. 520, 536-37
(1976); In Re Juvenile Appeal, 1 Conn. App. 463, 467-68 (1984). The TPR petition in the instant case was filed July 22, 1991 (amended 10/3/91, but not a substantive amendment).
(a) Abandonment
The petition alleges that the child has been abandoned by the mother, and by the father, in the sense that each parent failed to maintain a reasonable degree of interest, concern and responsibility as to the welfare of the child. See: General Statutes Section 17a-112(b)(1).
The court finds, applying a clear and convincing evidence standard, that respondent/father, Lionel M., has abandoned his child, Ana Maria M. He has maintained no reasonable degree of interest, concern, and responsibility as to the welfare of this child. CT Page 3566
The court finds that petitioner has established, by clear and convincing evidence, that respondent/mother, Nilda P., has abandoned the child, Ana Maria M. While the mother did visit the child approximately eleven times in 1990, when transported by DCYS, she has not seen the child since October, 1990, and has not called the foster home to inquire of the child for over a year. Nilda P. informed DCYS that she wished DCYS to furnish the necessary funds and she would arrange her own transportation; although the Department provided her with the money, and assisted in making arrangements for visitations, she still did not visit Ana. Although she had the telephone numbers of the foster homes, she did not regularly call respecting the child's well-being, and, when visitation did take place during the early stage of DCYS involvement, the mother made no effort to receive, and displayed no interest in, training with respect to the appropriate methods of caring for the seriously handicapped child. Similarly, Nilda P. did not follow through with, or cooperate in, the counseling and parenting classes put in place with a view toward developing and improving her capacity to provide adequate and reasonably informed parenting for Ana; in sum, the respondent/mother has maintained no contact with the child, or the foster parents, since the Fall of 1990, and has shown no interest in developing even minimal skills necessary to properly and sufficiently meet the specialized needs of this unfortunately afflicted little girl. In the court's view, the evidence, applying the appropriate standard of proof, establishes that respondent/mother has not maintained a reasonable degree of interest, or concern, or responsibility as to Ana's welfare. Unlike the common-law principle of abandonment applicable under the neglect provision in General Statutes Section 46b-120, the standard respecting statutory abandonment under Section 17a-112(b)(1) is "not whether the parents have shown some interest in their children"; rather "[c]ommon sense dictates that the parent's obligations toward . . [a] child go further than a minimal interest." (Emphasis in original). In re Rayna M., 13 Conn. App. 23, 37 (1987).
The court finds, by clear and convincing evidence, that with regard to both parents, petitioner has established abandonment as a statutory ground for termination of parental rights.
(b) Failure To Rehabilitate
The petition to terminate further alleges that Nilda P. and Lionel M. are the parents of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding and have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the CT Page 3567 child, they could assume a responsible position in the life of the child. General Statutes Section 17a-112(b)(2). Ana Maria M. was adjudicated a neglected and uncared for child on March 2, 1990 (committed 9/18/90).
With regard to both biological parents of this child, the court finds that the petitioner has proved, by clear and convincing evidence, the statutory ground, as alleged, under General Statutes Section 17a-112(b)(2). Respondent/father's whereabouts remain unknown, he has shown absolutely no interest in the child, and has taken no steps whatsoever towards any reunification. Respondent/mother has not followed through on any of the expectations; she has not visited with the child since October 1990; she has requested and taken the fare money from DCYS and has then not appeared for the arranged visitation; she has made no effort to learn the basic techniques necessary for the proper parenting of the handicapped child; and she has not cooperated in, or followed through with, the counseling and parenting classes which were put in place. It is indisputable that the mother's situation has not been an easy or pleasant one; however, she has not cooperated in the Department's efforts to effectuate an eventual reunification, and her capacity to fulfill the parenting responsibilities with respect to this specialized needs child has not improved, due to lack of interest and effort on her part, during the period of intervention. There is nothing, based on what has transpired and with consideration to the age and specialized needs of this severely handicapped child, to encourage any belief that within a reasonable time either of these biological parents could assume a responsible position in Ana Maria M.'s life.
With regard to the respondent/mother and the respondent/father, the court finds, on the basis of clear and convincing evidence, that each is the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding and each has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, either could assume a responsible position in the life of the child.
(c) No Ongoing Parent-Child Relationship
The petition also alleges, respecting both biological parents, that there exists no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of the parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be CT Page 3568 detrimental to the best interests of the child. General Statutes Section 17a-112(b)(4).
The court finds that with respect to both parents, petitioner has proved, by clear and convincing evidence, the statutory ground for termination under Section 17a-112(b)(4). There is no ongoing parent-child relationship between the respondent/father and Ana Maria M.,; as stated, he has played no role in this child's life, his whereabouts have remained unknown, and he has displayed no interest in the child whatsoever. To further deprive Ana permanency and a nurturing home on the speculation that sometime in the future Lionel M. might return and accept some responsibility in the child's life would be inconsistent with, and detrimental to, Ana Maria M.'s best interests.
Similarly, in the court's view, it has been established, clearly and convincingly, that there exists no ongoing parent child relationship between Ana and Nilda P. Respondent/mother has had no contact with the child since October 1990, the child recognizes the foster mother as "mommy", and it has been the foster parents, not the biological mother (or father), who have attended to, on a day-to-day basis, the demanding physical and educational needs of the child, as well as to Ana's emotional and moral needs. The best interests of this child are to be served by a permanent, loving, nurturing, constant home in which her specialized needs can be met adequately, skillfully, and consistently. Ana Maria M. needs and deserves no less. The natural mother has not visited, has not demonstrated any sustained interest in the child, and has not made an effort to learn and develop even the most rudimentary skills necessary for the proper care of the child. She has not followed through with appropriate counseling and parenting skills classes. The child is now six years old and has been in foster care, continuously, for two years; to allow further time for the establishment or reestablishment of an ongoing parent-child relationship between Nilda P. and Ana, thereby depriving Ana of permanency and constancy, would be inconsistent with, and detrimental to, the best interests of this unfortunately afflicted little girl.
Statutory One Year Requirement
Section 17a-112(b) permits the court to terminate parental rights upon clear and convincing proof of one or more of the four grounds set forth therein, provided, that termination is in the best interests of the child, and, that the circumstances constituting the grounds for termination have existed "over an extended period of time which, except as provided in subsection (c) . . . shall not be less than one CT Page 3569 year." Subsection (c) allows the court to waive the one year requirement if, from the totality of the circumstances surrounding the child, a waiver is necessary to promote the best interests of the child.
Ana Marie M.'s best interests, as stated, are to be served by permanency. She has made significant progress in a nurturing home where her specialized needs are being skillfully attended to; the child should be assured that she will continue to receive love, nurturing, and appropriate care, rather than a return to the conditions and lack of care which existed when DCYS first intervened. The respondent/father has not had contact with the child; the respondent/mother has not maintained contact, has made virtually no effort to develop basic skills necessary for the proper care of Ana, and for months has not shown any sustained interest regarding the child, or her well being. Postponing further the freeing of this child for adoption, and thereby denying her the needed permanency and constancy, would be inconsistent with the child's best interest; petitioner has established by clear and convincing evidence that a waiver of the one-year statutory requirement is necessary to promote the best interests of Ana Maria M.[16]
Disposition: Best Interests Of Ana Maria M.
Aside from the waiver issue discussed in the preceding section of this opinion, the statute (Section 17a-112(b)) permits the court to grant the petition to terminate parental rights only upon a determination, grounded on clear and convincing proof, that to terminate would be in the best interests of the child. Additionally, it is statutorily required that the court consider the six factors outlined in Section 17a-112(d). On the instant petition, evidence was last received on January 10, 1992.[17]
As stated, the evidence, in my view, certainly establishes, clearly and convincing, that it is in this child's best interests, that respondent/mother's and father's parental rights be terminated, thereby freeing Ana Maria M. for adoption. The child was born with multiple medical complications associated with the congenital syphilis syndrome, including spastic quadriplegic cerebral palsy and mental retardation. She has been in foster care approaching two years; she is six years of age. At the time of DCYS's initial intervention, the child was not receiving the skilled care her unfortunate condition required, was maintained in inappropriate and uncleanly surroundings, was unresponsive, non-vocal, immobile, and suffered from extraordinary nutritional problems. In foster care, the child, as the result of proficient care and attention, has progressed CT Page 3570 markedly medically, educationally, and developmentally. The biological father has had no interest or role in the child's life; the biological mother has not visited with the child since the fall of 1990, has not even telephoned the foster parents to inquire of Ana since the early summer of 1990, has made no effort to learn or cultivate even minimal skills needed for the child's proper care, has neglected to cooperate in counseling and to attend parenting classes, and, in general, has shown no sustained interest in this handicapped child's well-being. As stated aforesaid, the child's best interests, at this point, clearly demand permanency and constancy: an adoptive home that can provide love, nurturing, lasting devotion, and informed, specialized attention.
The court has considered, carefully, the factors enumerated in Section 17a-112(d)(1) through (6), and hereby finds (applying a clear and convincing evidence standard), the following:
(1) Timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.
Respondent/father's whereabouts remained unknown; thus, no services could be put in place relative to his reunification with this child.
DCYS promptly arranged counseling through the Institute For The Hispanic Family; respondent/mother did not cooperate in, or complete, the counseling. Similarly, Nilda P. did not follow through with parenting classes quite properly set up for the mother's benefit. The Department provided transportation for the out-of-town visitation. After the mother stated that she would provide her own transportation if given the requested funds, she was shown exactly how to travel to the specialized foster home. Although provided the monetary sums, respondent/mother nevertheless neglected to visit the child, to phone the foster parent(s) regarding the child, and made virtually no effort to learn appropriate techniques for the necessary care of the handicapped child. The agency (DCYS) provided timely, adequate, and appropriate services to Nilda P.; however, the mother did not cooperate in the Department's efforts to reunite the parent with this little girl.
(2) Terms of any applicable court order entered into and agreed upon by an individual or agency and the parent and the extent to which all parties have fulfilled their obligations under such order.
Since the respondent/father was never present, there CT Page 3571 were no court orders pertaining to him.
The court ordered psychological evaluations of respondent/mother, child, and the maternal grandmother. It appears from the official court file that both respondent/mother and the agency fulfilled their respective obligations under the order(s).
Preliminary expectations were established by the court, pending receipt of the ordered evaluation. Thereafter, specific expectations were set, substantially in conformity with the recommendations of the court assigned evaluator; respondent/mother did not follow through with visitation, with counseling, with parenting classes, nor did she cooperate in learning the proper methods for the care, and stimulation, of this handicapped child.
(3) Feelings and emotional ties of child with respect to her parents, any guardian of her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
There is no evidence of any emotional ties or feelings between the child and her biological father; the father has had no contact with the child during the duration of DCYS' intervention, and has played no significant role in the child's life.
Respondent/mother was the principal, though perhaps somewhat ineffective, caretaker of this handicapped child for the initial four years of her life. There is an indication of initial bonding with the biological mother. From the standpoint of the mother, it appears from the record that she loved the child, but has acknowledged that the child is too much for her.
The little girl has clearly developed a positive relationship with the specialized foster parents, has feelings and emotional ties to the foster parents (as evidenced by her joy and glee upon seeing the foster parent(s)), and she refers to the foster mother as "mommy".
(4) The age of the child
Ana Maria M. was born on February 24, 1986; she is six years of age. Given the child's age, the period of time she has been in foster care, respondent/mother's lack of contact with the child, and the child's specialized needs, freeing Ana Maria M. now for adoption is manifestly consistent with her best interests. CT Page 3572
(5) The efforts the parent has made to adjust his/her circumstances, conduct and conditions to make it in the best interests of the child to return to his/her home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions and (B) maintenance of regular contact or communication with the guardian or other custodian of the child.
Lionel M. has had no contact with Ana Maria M. during the period of the child's commitment, he has not communicated at all with DCYS regarding his daughter, nor with the foster parents, and he has made no effort to adjust his circumstances, conduct, and conditions in any manner which would make return of Ana Maria M. to him consistent with her best interests; respondent/father's whereabouts remain unknown.
Nilda P. has made little effort to adjust her circumstances, conduct, and conditions such as would make it in the best interests of Ana Maria M. to return to the mother's home in the foreseeable future. Respondent/mother has not followed through with the counseling recommended by the evaluator and put in place by DCYS, she has not completed the parenting classes, and, most importantly, she has neglected to learn basic skills and techniques necessary for the appropriate care of the seriously handicapped child. Nilda P. has not visited the child since the Fall of 1990, even though the Department has been willing to provide transportation, and in lieu thereof, has provided her with travel funds. She has not telephoned the foster parents in months to inquire of the child, has not communicated in writing with them, and has displayed no sustained interest in the child's well-being.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable action of any other person or by the economic circumstances of the parent.
There is no evidence that Lionel M. has been prevented in any way, or by anyone, or by any circumstance, from maintaining a meaningful relationship with Ana Maria M.
Respondent/mother has not been prevented in any way, or by any one, or by any circumstance, from developing and/or maintaining a meaningful relationship with the child. A regular visitation schedule was arranged by DCYS as per the court CT Page 3573 expectation; the anticipated visitation was to enable mother to develop and maintain a full relationship with her daughter, while at the same time, to provide an opportunity for the parent to learn appropriate and necessary care skills from the specialized foster parents. Respondent/mother did not follow through with the arranged visitation (or with the in place counseling); she was initially transported by DCYS for the scheduled visitation, but thereafter told the worker that she would arrange her own transportation and requested funds for that purpose. Although the mother was given the funds she requested, she did not go to visit her daughter. Although it was made clear to respondent/mother that she could always telephone, or otherwise communicate with, the foster parents regarding Ana, she did not regularly do so. On the evidence as developed, the court cannot find that respondent/mother was prevented from maintaining a meaningful relationship with this child by any unreasonable act or conduct on the part of any person or agency, or by economic circumstances.
The petitioner has met its burden of proof by clear and convincing evidence; the best interests of Ana Maria M. will clearly be served by freeing the child for adoption, and by provision of a stable, loving, nurturing, secure, permanent home environment.
The petition to terminate the parental rights of the natural parents, Nilda P. and Lionel M., to the child Ana Maria M. is hereby Granted; and the Department of Children and Youth Services is appointed Statutory Parent for the said Ana Maria M.
In accordance with General Statutes Section 17a-112(i), the written progress report (case plan report) shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.
[EDITORS' NOTE: THE JUDGE'S SIGNATURE IS ELECTRONICALLY NON-TRANSFERRABLE.]